**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | **CRIMINAL NO. JKB-21-0458** |
| | * | |
| ELIAS NICK COSTIANES, | * | |
| | * | |
| Defendant. | * | |
| | ******* | |

**GOVERNMENT'S RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION TO SUPPRESS STATEMENTS**

On November 18, 2021, a federal grand jury in the District of Maryland returned an indictment charging the Defendant, Elias Nick Costianes, with two counts of conspiracy to distribute and to possess with intent to distribute a controlled substance, in violation of 21 U.S.C. §§ 846 and 841(a)(1), and one count of possession of a firearm and ammunition by an unlawful user of any controlled substance, in violation of 18 U.S.C. § 922(g)(3). *See* Indictment, ECF 17. On December 28, 2021, the Defendant filed a Motion to Suppress Statements. *See* Def.'s Mot., ECF 25. For the following reasons, the Court should deny the Defendant's Motion in its entirety.

I.      **BACKGROUND**

On February 3, 2021, the U.S. District Court for the District of Columbia issued an arrest warrant for the Defendant based on a criminal complaint charging him with various offenses relating to his participation in the riot at the U.S. Capitol on January 6, 2021. *See* Case No. 21-mj-0196 (D.D.C. Feb. 3, 2021), ECF 1 (attached hereto as **Exhibit A**).[1] One week later, on February 10, 2021, the U.S. District Court for the District of Maryland issued warrants authorizing,

---

[1] The Defendant was subsequently charged with similar offenses relating to his participation in the Capitol riot through an indictment returned by the grand jury for the District of Columbia. *See* Crim. No. 1:21-cr-00180-RJL (D.D.C. Mar. 3, 2021), ECF 7.

among other things, a search of the Defendant's residence in Nottingham, Maryland, for evidence, fruits, and instrumentalities of the Defendant's participation in the Capitol riot.

### A.    The Defendant's Statements on February 12, 2021

Two days later, on February 12, 2021, members of the Federal Bureau of Investigation ("FBI")'s Baltimore and Washington Field Offices executed the search and arrest warrants at the Defendant's residence.  At approximately 6:02 a.m., tactical officers conducted a "knock and announce" at the front door, and no one answered.  After waiting a reasonable period of time, the officers forced entry into the residence and located the Defendant on a couch in the living room.[2] At approximately 6:10 a.m., the officers took the Defendant into custody and conducted a protective sweep of the residence.  After the residence was secured, at approximately 6:35 a.m., the officers turned the residence over to the investigative team.

### 1.    The Defendant's Statements at His Residence

At approximately 6:40 a.m., the Defendant was interviewed by two members of the investigative team, Special Agent Kenneth Shappee and Special Agent Sean O'Rourke.  The agents began the interview by advising the Defendant of his *Miranda* rights using the FBI's Form FD-395 "Advice of Rights."  *See* Federal Bureau of Investigation Advice of Rights (attached hereto as **Exhibit B**).  The Defendant verbally acknowledged understanding his rights and stated that he was willing to be interviewed by the agents without counsel present.  Although the Defendant declined to sign the Form FD-395, both agents signed the Form as witnesses to the Defendant being advised of the rights enumerated on the Form.

The agents then interviewed the Defendant for approximately 35 minutes.  Among other things, the Defendant told the agents that he had attended college in West Virginia and worked

---

[2] Officers also encountered the Defendant's sister, who owned the residence.

near Annapolis, Maryland.  The Defendant also disclosed that he kept four firearms in cases behind a safe in the basement of his residence.  Specifically, the Defendant identified the firearms as: (1) a Glock 17, (2) a Smith & Wesson assault rifle, (3) a Remington shotgun (which the Defendant stated was a Valentine's Day present from his "ex"), and (4) a hunting rifle.  The Defendant stated that the hunting rifle "fired .223 [caliber]," but indicated that none of the firearms were loaded. Consistent with the Defendant's statements, agents located the four unloaded firearms in the basement of the Defendant's residence—along with hundreds of rounds of ammunition. Elsewhere in the Defendant's residence, agents located an empty, used hypodermic needle, and four vials containing suspected testosterone, a Schedule III controlled substance.

The agents paused the interview at approximately 7:15 a.m.  At that point, Agent Shappee explained to the Defendant that he would remain in custody to be transported from his residence; first, to the FBI's Washington Field Office ("WFO") to be booked for his arrest, and second, to District Court in D.C. for an initial appearance on the criminal complaint.  The Defendant indicated that he understood.  The Defendant also told agents that he was willing to voluntarily surrender his firearms to FBI custody pending the resolution of his D.C. charges, and signed an FBI Form FD-597 effecting the surrender.

### 2.    The Defendant's Statements During Transport

At approximately 7:25 a.m., Agent Shappee and FBI Special Agent Matthew Hamel began driving the Defendant from his residence to WFO.  Agent Shappee introduced the Defendant to Agent Hamel and reminded the Defendant that he was still in custody and that the rights that had been read to the Defendant at his residence remained in effect.  The Defendant verbally confirmed that he understood his *Miranda* rights and that he was still willing to answer the agents' questions during the drive to WFO.

Among other things, the Defendant told Agent Shappee and Agent Hamel that he was born in Morgantown, West Virginia, and studied biology at West Virginia University.  The Defendant stated that he used to manage a BMW dealership in Rockville, Maryland, and that he was currently employed by a large real estate construction company.  The Defendant stated further that, on January 6, 2021, he attended a rally on the National Mall in Washington, D.C., and that, at approximately 10 a.m. that day, he had smoked a marijuana cigarette with other individuals at the rally.[3]  The Defendant added that he still had a small quantity of marijuana in a jar inside his personal vehicle.  After the rally, the Defendant stated that he entered the U.S. Capitol and recorded his entry on video, which was stored on his cellphone and "backed up" to his Apple devices.  The Defendant acknowledged that he also entered the U.S. Senate chamber but left the Capitol after approximately 15 minutes.  The Defendant also stated that he does not take any prescription drugs.

Approximately 20 minutes into the interview, at 7:45 a.m., Agent Shappee called the Defendant's employer so that the Defendant could explain that he would be unable to work that day.  Agent Shappee also read the D.C. charges to the Defendant and showed the Defendant the arrest warrant so that the Defendant could read it himself.  The agents concluded the interview at approximately 8:15 a.m., and their vehicle arrived at WFO approximately 10 minutes later.  The Defendant was not questioned further.  After the Defendant was booked at WFO, he was brought to U.S. District Court in D.C., where the Defendant made his initial appearance, was appointed counsel with respect to the charges in the criminal complaint, and was released on conditions pending trial.  The Defendant returned to his residence the same day.

On February 14, 2021, two days later, the Defendant separately called Agents Shappee and O'Rourke to ask about the FBI returning one of the cellphones it had seized during the search on

---

[3] Marijuana is a Schedule I controlled substance.

February 12.  Both Agents Shappee and O'Rourke independently advised the Defendant that they could not discuss the Defendant's case with the Defendant because the Defendant was represented by counsel.

### B.    The Defendant's Statements on February 17, 2021

Based on the seizure of firearms, ammunition, and suspected controlled substances from the Defendant's residence, among other evidence, the U.S. District Court in Maryland issued a second warrant authorizing FBI agents to draw a sample of the Defendant's blood to search for evidence of his illegal use and possession of controlled substances in Maryland, in possible violation of 18 U.S.C. § 922(g)(3) and 21 U.S.C. § 844(a).  *See* Case No. 1:21-mj-393 TMD (D. Md. Feb. 15, 2021) (attached hereto as **Exhibit C**).[4]  On February 17, 2021, Agent O'Rourke contacted the Defendant and advised the Defendant that he had paperwork to serve the Defendant. The Defendant agreed to meet Agent O'Rourke that evening outside 9000 Franklin Square Road, in Rossdale, Maryland—the location of MedStar Franklin Square Medical Center, where the Defendant had been a patient.  There, Agent O'Rourke served the Defendant with inventories of seizures made during the execution of search warrants upon the Defendant's residence, vehicle, and cellphone on February 12.  Agent O'Rourke also gave the Defendant a copy of the blood draw warrant.  After Agent O'Rourke explained the nature of the warrant, the Defendant agreed to accompany Agent O'Rourke into the Medical Center for the purpose of executing the blood draw.

Agent O'Rourke and the Defendant entered the Medical Center at approximately 6:00 p.m. While a room was being prepared for the blood draw, the Defendant and Agent O'Rourke were joined by FBI Special Agent Ian Montijo and Task Force Officer Keith Sokolowski.  At

---

[4] As attached to this Response, Exhibit C does not include Exhibit 1 to the affidavit in support of the blood draw warrant.  The government can make available Exhibit 1, which was the affidavit in support of the initial search warrant executed on February 12, 2021, upon the Court's request.

approximately 6:09 p.m., a registered nurse ("RN") with the Medical Center collected two vials of the Defendant's blood. While his blood was being collected, the Defendant made several spontaneous utterances regarding his presence at the U.S. Capitol on January 6, 2021—even as the Defendant acknowledged, "I know that I shouldn't be saying anything about this to you guys because of some Federal Code or whatever." TFO Sokolowski reminded the Defendant that the agents were there solely for the execution of the search warrant, that the Defendant was not required to discuss any details of his case, and that he would not be asked about it.

Despite TFO Sokolowski's warning, the Defendant continued to make additional unprompted statements to agents. After the RN who collected the Defendant's blood sample informed the Defendant that his discharge paperwork was almost complete, the Defendant told the agents that he had been a patient at the Medical Center, that he had been diagnosed with "low T," and that he was "at 278," presumably referring to an unspecified blood-testosterone measurement. In response, Agent O'Rourke asked the Defendant what he took for his condition. The Defendant replied, "I take something."

Several minutes later, another RN came into the room. The RN asked the Defendant routine medical questions, including whether the Defendant was an existing patient of the Medical Center. The Defendant told the RN that he had been seeing a physician at the Medical Center for injuries sustained during an accident that occurred in 2020. The RN then asked where the Defendant was filling his prescriptions. The Defendant responded, "Oh, I don't believe in those." The Defendant was discharged shortly thereafter.

On February 23, 2021, the Defendant called Agent O'Rourke to share a link to an online video of the riot at the U.S. Capitol on January 6, 2021. Agent O'Rourke once more admonished the Defendant that the Defendant should not contact the FBI to discuss matters relating to the

attack on the U.S. Capitol or to the investigation of the Defendant—except through the Defendant's attorney.

## II.    ARGUMENT

The Defendant now moves to suppress all of his statements to law enforcement.  He argues, alternatively, that agents failed to advise him of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), that any waiver of those rights was "defective," and that his statements also were, in any event, involuntary.  *See* Def.'s Mot. at 2–3.  The Defendant further contends that his statements to agents on February 17, 2021, were obtained in violation of his right to counsel.  *See id.* at 3.  Each of the Defendant's arguments is meritless.

### A.    The Defendant's February 12 Statements Should Not Be Suppressed.

The Court should deny the Defendant's motion to suppress the statements he made to agents on February 12, 2021, both at the Defendant's residence and during his transit to WFO. Although the Defendant was in "custody" for *Miranda* purposes during questioning that day, *see, e.g.*, *United States v. Giddins*, 858 F.3d 870, 879 (4th Cir. 2017) (asking "whether a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave" (quoting *United States v. Hashime*, 734 F.3d 278, 282–83 (4th Cir. 2013))), statements made in response to custodial interrogation are admissible notwithstanding a defendant's Fifth and Sixth Amendment rights where, as here: (1) the defendant is advised in accordance with *Miranda* and knowingly, intelligently, and voluntarily waives his rights, *see, e.g.*, *United States v. Holmes*, 670 F.3d 586, 591 (4th Cir. 2012); and (2) the defendant's statements—even following a valid *Miranda* waiver—are not otherwise involuntarily obtained, *see, e.g.*, *United States v. Cristobal*, 293 F.3d 134, 142 (4th Cir. 2002).

1.    <u>The Defendant Validly Waived His *Miranda* Rights.</u>

The Defendant argues that his statements should be suppressed because he made them "prior to being advised of or fully understanding" his *Miranda* rights, or that, to the extent he waived his rights, the waiver was defective.  Def.'s Mot. at 2.  The Defendant is wrong.

a.    *The Defendant Was Properly Advised Under* Miranda*.*

First, the Defendant's contention that agents failed to provide *Miranda* warnings before questioning him is factually incorrect.  At the beginning of the interview at the Defendant's residence, an agent read the Defendant the rights enumerated in FBI Form FD-395.  *See* Exh. B. Agents Shappee and O'Rourke then witnessed the Form, indicating that the Defendant had, in fact, been advised of the rights described thereon.  *See id.*  The Defendant cannot credibly contend that he was not advised of his *Miranda* rights when two agents personally witnessed the advisement. Nor can the Defendant contend that the Form's warnings were insufficient to adequately convey those rights.  *Cf., e.g.*, *United States v. Frankson*, 83 F.3d 79 (4th Cir. 1996) (quoting *California v. Prysock*, 453 U.S. 355, 359 (1981); *and Duckworth v. Eagan*, 492 U.S. 195, 203 (1989) (holding *Miranda* satisfied as long as "warnings reasonably convey to [a suspect] his rights")).  The agents advised the Defendant of his right to remain silent, his right to speak with a lawyer before questioning, his right to have a lawyer present during questioning, his right to have counsel appointed before questioning if he could not afford it, his right to stop during any questioning, and the fact that anything he said could be used against him in court.  *See* Exh. B.  These warnings plainly satisfied *Miranda*.  *See, e.g.*, *Dickerson v. United States*, 530 U.S. 428, 435 (2000).

Additionally, the Defendant was reminded of his *Miranda* rights before his interview continued during the transport from his residence to WFO.  Agent Shappee advised the Defendant that he remained in custody and that the rights that Agents Shappee and O'Rourke had explained

to the Defendant at his residence remained in effect. Because Agent Hamel had joined Agent Shappee for the transport, there were also two witnesses to the Defendant's second reminder. In any event, Agent Shappee had no obligation to re-advise the Defendant of his *Miranda* rights before resuming the interview because "[t]he mere passage of time . . . does not compromise a *Miranda* warning." *Frankson*, 83 F.3d at 83. Indeed, courts have "consistently upheld the integrity of *Miranda* warnings even in cases where *several hours* have elapsed between reading the warning and interrogation." *Id.* (emphasis added). The Defendant's interview resumed at 7:25 a.m., which was just 45 minutes after Agents Shappee and O'Rourke had first advised the Defendant of his *Miranda* rights at the Defendant's residence. Accordingly, no additional *Miranda* warnings were necessary. *Cf., e.g.*, *id.* ("We too believe that [the defendant's] initial Miranda warning was in no way compromised by the passage of two and one-half hours between the issuance of his warning and the point at which he began to confess his crimes and cooperate with the police.").

        b.    *The Defendant Knowingly, Intelligently, and Voluntarily Relinquished His* Miranda *Rights.*

Second, the Defendant validly waived his *Miranda* rights. A *Miranda* waiver is valid when "the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension." *Moran v. Burbine*, 475 U.S. 412, 421 (1986) (internal quotation marks omitted). A waiver bears the "requisite level of comprehension" when it is "knowing and intelligent," *Correll v. Thompson*, 63 F.3d 1279, 1288 (4th Cir. 1995)—that is, when it is made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it," *Moran*, 475 U.S. at 421. And a waiver is the product of an "uncoerced choice"—*i.e.*, the waiver is "voluntary"—when it is "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran*, 475 U.S. at 421. The Defendant's *Miranda* waiver here was knowing and intelligent, and voluntary.

      i.  The Waiver Was Knowing and Intelligent.

  Whether a defendant's waiver was made with "full awareness of the nature of the right being abandoned and the consequences of the decision to abandon it"—and, therefore, was knowing and intelligent—"requires an examination of the totality of the circumstances surrounding the interrogation, including the suspect's intelligence and education, age and familiarity with the criminal justice system, and the proximity of the waiver to the giving of *Miranda* warnings." *United States v. Dire*, 680 F.3d 446, 474 (4th Cir. 2012) (quoting *Correll*, 63 F.3d at 1288). The circumstances here admit only one conclusion: that the Defendant's *Miranda* waiver was both knowing and intelligent.[5]

  As an initial matter, the Defendant was *advised* of his *Miranda* rights and the consequences of abandoning them. As stated above, the agents witnessed FBI Form FD-395, attesting that they had, in fact, conducted this advisement. *See* Exh. B. Moreover, the agents also will testify that the Defendant explicitly (and unambiguously) stated that he understood his rights and that he was willing to answer questions without a lawyer present. There is no evidence that the Defendant, a 43-year-old adult, did not, in fact, comprehend what he was saying when he told the agents that he understood—and would waive—his *Miranda* rights. As the Defendant explained, he was born in the United States, studied biology at a university in West Virginia, and managed a luxury car dealership in Maryland. In describing his prior arrest relating to "a confrontation" with a girlfriend,

---

[5] "What the caselaw means by intelligent is that the suspect is fully aware of the consequences of his decision to abandon *Miranda* rights." *United States v. Hoang*, 238 F. Supp. 3d 775, 784 n.6 (E.D. Va. 2017) (citing *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). The Fifth Amendment "does not require that a suspect's decision to waive his *Miranda* rights be either smart or sensible, nor does the Fifth Amendment require 'that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege.'" *Id.* (quoting *Colorado v. Spring*, 479 U.S. 564, 574 (1987)).

the Defendant further acknowledged that he had prior experience with the criminal justice system.[6] And the Defendant waived his *Miranda* rights immediately after the agents had explained those rights to him.  In sum, the relevant circumstances provide no basis to suggest the Defendant lacked "full awareness of the nature of the right being abandoned and the consequences of the decision to abandon it."  *Moran*, 475 U.S. at 421.

Nor is the conclusion that the Defendant's waiver was knowing and intelligent undermined by the Defendant's apparent refusal to sign Form FD-395.  Although a defendant's signature can serve as evidence of a knowing and intelligent waiver, a refusal to sign a waiver of rights form does not defeat such a finding—as Fourth Circuit courts have long acknowledged.  *See, e.g.*, *United States v. Adams*, 462 F. App'x 369, 377 (4th Cir. 2012) (observing "failure to sign a waiver form does not invalidate a subsequent waiver of *Miranda* rights" (citing *United States v. Thompson*, 417 F.2d 196, 197 (4th Cir. 1969) (*per curiam*) (holding that defendant's "refusal to sign a written waiver did not render the confession inadmissible"))); *United States v. Hoang*, 238 F. Supp. 3d 775, 784 (E.D. Va. 2017) (observing that "a signed waiver form is not even necessary to establish a valid waiver"); *United States v. Ventura*, Crim. No. WDQ-10-0770, 2013 WL 1455278, at *13 n.35 (D. Md. Apr. 8, 2013) ("Of course, a suspect's refusal to sign a written waiver does not, in itself, render his oral waiver insufficient." (citing *Thompson*, 417 F.2d at 197)).  Thus, when a defendant's waiver is verbal and explicit, a written waiver is redundant and unnecessary.[7]  This is particularly true where, as here, the Defendant told agents on two separate occasions—at his

---

[6] The Defendant explained that his charges were later dismissed.

[7] Of course, a verbal waiver does not even need to be explicit to be valid.  *Cf., e.g.*, *United States v. Cardwell,* 433 F.3d 378, 389–90 (4th Cir. 2005) (finding "implied waiver" in defendant's willingness to answer questions after being advised of rights).

residence and again during his transport—that he understood his *Miranda* rights and that he was willing to give them up.

<div style="text-align:center">ii.    The Waiver Was Voluntary.</div>

Not only was the Defendant's *Miranda* waiver knowing and intelligent, but it was also voluntary. A *Miranda* waiver is involuntary only when "the defendant's will has been 'overborne' or his 'capacity for self-determination critically impaired' . . . because of coercive police conduct." *Cristobal*, 293 F.3d at 140 (quoting *United States v. Pelton*, 835 F.2d 1067, 1071 (4th Cir. 1987)). Neither condition was present here.

As the Fourth Circuit has indicated, "[c]oercive police activity is a *necessary predicate* to a finding that . . . a waiver of *Miranda* rights is not voluntary." *Cristobal*, 293 F.3d at 140–41 (emphasis added). But the Defendant has not identified any such predicate. Nor could he. Examples of coercive police behavior include "subjecting the suspect to 'severe physical abuse,' holding the suspect 'incommunicado and question[ing him] for over 36 hours without sleep or rest,' giving the suspect truth serums, and threatening a wounded suspect with a loaded gun." *Hoang*, 238 F. Supp. 3d at 785 n.7 (citing *Cristobal*, 293 F.3d at 140 (collecting cases)). There was no such "police overreaching" in this case. *Cristobal*, 293 F.3d at 140. To the contrary, the agents went out of their way to accommodate the Defendant. The agents cut short an otherwise productive interview at the Defendant's residence so that they could bring the Defendant to Washington, D.C., in time to be processed and brought to court for his initial appearance the same day. During the Defendant's transport, the agents paused the continuing interview to allow the Defendant to call his employer to explain that he would not make it to work that day. And, rather than simply reading it to the Defendant, Agent Shappee gave the Defendant a copy of the arrest warrant so that the Defendant could read it himself.

In any event, there is also no basis to conclude that the Defendant's will had been "overborne" or that his capacity for self-determination became "critically impaired." To evaluate this question, courts examine "the totality of the circumstances," including "the characteristics of the defendant," the "setting of the interview," and the details of the questioning. *Id.* The only conclusion supported by the unremarkable circumstances of this case is that the Defendant's waiver was voluntary.

Again, the Defendant was a middle-aged, college-educated, U.S. citizen who had prior experience with the criminal justice system. He was intellectually sophisticated enough to manage a luxury car dealership. The Defendant was interviewed by no more than two agents at any one time. The first interview took place in an open area between the Defendant's living room and kitchen; and the second interview occurred while the Defendant was sitting behind the agents as they drove him to WFO. The Defendant was reminded of his *Miranda* rights at the very beginning of each interview. Each time, the Defendant immediately stated that he understood his rights and was nonetheless willing to answer the agents' questions. And the Defendant's waivers were absolutely unequivocal. This is simply not a case where law enforcement has "attempted to wring a . . . *Miranda* waiver out of an accused against his will." *Cristobal*, 293 F.3d at 141 (quoting *Blackburn v. Alabama*, 361 U.S. 199, 206–07 (1960)) (cleaned up). Indeed, the Defendant's refusal to sign the written waiver in Form FD-395 is powerful affirmative evidence that the Defendant retained full control of his "capacity for self-determination" when he decided to verbally relinquish his *Miranda* rights. *Id.* at 140.

2.    The Defendant's Statements Were Otherwise Voluntary.

The Defendant further argues that, even if he validly waived his *Miranda* rights, his statements to law enforcement were nonetheless involuntary. *See* ECF 25 at 2–3. The argument is likewise meritless.

A statement is "involuntary under the Fifth Amendment only if it is involuntary within the meaning of the Due Process Clause." *United States v. Braxton*, 112 F.3d 777, 780 (4th Cir. 1997) (*en banc*) (internal quotation marks omitted). And a statement is involuntary for Due Process purposes only when the statement is "extracted by . . . threats or violence," or "obtained by . . . direct or implied promises" or "the exertion of . . . improper influence." *United States v. Braxton*, 112 F.3d 777, 780 (4th Cir. 1997) (*en banc*). Courts use "the same inquiry when analyzing the voluntariness of a *Miranda* waiver as when analyzing the voluntariness of statements under the Due Process Clause." *Cristobal*, 293 F.3d at 140 (citing *Colorado v. Connelly*, 479 U.S. at 169). Accordingly, the question is, again, "whether the defendant's will has been 'overborne' or his 'capacity for self-determination critically impaired'" due to "coercive police conduct," *Cristobal*, 293 F.3d at 140 (quoting *Pelton*, 835 F.2d at 1071), which requires examining "the totality of the circumstances," including the defendant's individual characteristics and background, the setting in which the statement occurred, and the details of the interview, *United States v. Elie*, 111 F.3d 1135, 1143–44 (4th Cir. 1997). Although the government bears the burden of proving voluntariness, *see Lego v. Twomey*, 404 U.S. 477, 489 (1972), that burden is easily met here.

Not only is there no evidence—or even an allegation—of "coercive" police conduct, but the relevant circumstances also provide no grounds for concluding that the Defendant's will was "overborne" or that his capacity for self-determination was "critically impaired." *Cristobal*, 293 F.3d at 140. Certainly nothing about the Defendant's individual characteristics and background

suggested as much.  The Defendant was a 42-year-old American citizen who studied biology at the college level.  The Defendant had managed a BMW dealership and was presently employed by a large real estate construction company.  And, again, by his own admission, the Defendant had prior experience with the criminal justice system.

Nor did the settings in which the Defendant's statements occurred support a finding of involuntariness.  Only three agents in total were involved in interviewing the Defendant on February 12, 2021; and no more than two agents were involved at any one time.  One agent, Agent Shappee, participated in both interviews.  At the beginning of each interview, the agents reminded the Defendant of his *Miranda* rights, and the Defendant immediately responded by stating that he understood his rights and was willing to answer the agents' questions.  And the Defendant's verbal waivers were unambiguous.

The interview details likewise support a finding of voluntariness.  The first interview, which took place inside the Defendant's residence, was just 35 minutes long.  It was then the agents, not the Defendant, who ended the first interview—so that the Defendant could be transported to D.C. in a timely fashion.  The second interview, moreover, was only 50 minutes long and took place while the Defendant was sitting behind the agents as they were driving him to D.C.  The agents even paused the interview so that the Defendant could read the arrest warrant and notify his employer that he would be absent from work.  And, again, it was the agents, not the Defendant, who ended the second interview—10 minutes *before* their vehicle arrived at WFO.  Finally, the Defendant's answers were responsive to the agent's questions, and there was no evidence that the Defendant suffered from any mental incapacity.  The Defendant accurately reported where he kept firearms in his residence; recalled that he kept a quantity of marijuana in

his personal vehicle; and described his whereabouts throughout January 6, 2021—which had been nearly six weeks earlier.

In short, there is no basis for the Defendant to suggest that his statements were "extracted by . . . threats or violence," or "obtained by . . . direct or implied promises" or "the exertion of . . . improper influence." *Braxton*, 112 F.3d at 780.[8] There is even affirmative evidence demonstrating that the Defendant was not improperly influenced by the agents' conduct. As already discussed, the Defendant refused to sign Form FD-395 despite being asked by agents to sign it. And, two days later, the Defendant—notwithstanding his representation by counsel—called Agents Shappee and O'Rourke directly to discuss the return of a seized cellphone. This is not the conduct of a person whose will was "overborne" or whose capacity for self-determination was "critically impaired." *Cristobal*, 293 F.3d at 140. Accordingly, the Court should deny the Defendant's motion to suppress his statements to law enforcement on February 12, 2021.

**B.    The Defendant's February 17 Statements Should Not Be Suppressed.**

The Court should likewise deny the Defendant's request to suppress his statements on February 17, 2021. In urging suppression, the Defendant argues that these statements were

---

[8] Nor would a different conclusion result in the event the Defendant argues in reply—as the Defendant argued in seeking to suppress the same statements in the District of Columbia, *see* 21-cr-00180-RJL (D.D.C.), ECF 38—that his statements were involuntary because they coincided with the execution of search and arrest warrants at his residence. The voluntariness of a confession "is not . . . 'to be equated with the absolute absence of intimidation,' for under this test virtually no statement would be voluntary.'" *Braxton*, 112 F.3d at 783 (quoting *Pelton*, 835 F.2d at 1072 (quoting *United States v. Wertz*, 625 F.2d 1128, 1134 (4th Cir. 1980))). Insofar as the Defendant was alarmed by the operation, that was not the result of *coercive* police conduct but rather "the consequence of the severity of the offenses he chose to commit." *United States v. Mashburn*, 406 F.3d 303, 310 (4th Cir. 2005). In any event, the voluntariness analysis requires examining the totality of the circumstances—and not one discrete and unremarkable feature in isolation. *See, e.g., Elie*, 111 F.3d at 1144 (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973)).

obtained in violation of *Miranda*, the Fifth Amendment, and his right to counsel.  *See* ECF 25 at 2–3.  Each argument is meritless.

1.      No Sixth Amendment Right to Counsel Had Yet Attached.

The Defendant argues that, because counsel had been appointed to represent him in connection with the D.C. criminal complaint on February 12, *see* Case No. 21-mj-0196 (D.D.C.), agents were required to contact counsel before meeting with the Defendant on February 17, *see* ECF 25 at 5.  The Defendant is wrong.

First, the Defendant's argument fails because "the filing of a federal criminal complaint does not give rise to any Sixth Amendment right."  *United States v. Alvarado*, 440 F.3d 191, 200 (4th Cir. 2006); *accord, e.g.*, *Beck v. Bowersox*, 362 F.3d 1095, 1101–02 & n.4 (8th Cir. 2004); *United States v. Langley*, 848 F.2d 152, 153 (11th Cir. 1988) (*per curiam*); *United States v. Pace*, 833 F.2d 1307, 1312 (9th Cir. 1987); *United States v. Duvall*, 537 F.2d 15, 22 (2d Cir. 1976).  The Sixth Amendment applies only to "criminal prosecutions," and the filing of a federal criminal complaint "does not commence a formal prosecution."  *Id.* at 199, 200.  Nor is formal prosecution commenced by a defendant's arrest or initial appearance on a criminal complaint.  *See, e.g.*, *United States v. D'Anjou*, 16 F.3d 604, 608 (4th Cir. 1994) (observing that defendant's Sixth Amendment right had not attached prior to arraignment, even after arrest); *United States v. Foster*, Crim. No. WDQ-12-0319, 2012 WL 5995442, at *4 (D. Md. Nov. 28, 2012) (citing *Alvarado*, 440 F.3d at 200).  Accordingly, the agents were not prohibited from contacting the Defendant without first notifying counsel because the Defendant had no Sixth Amendment protection against such contact as a result of the criminal complaint, the Defendant's arrest, or his initial appearance in D.C.

Second, even if the Defendant's Sixth Amendment rights had attached as a consequence of the criminal complaint, the Defendant's arrest, or his initial appearance in D.C., the Defendant had

no Sixth Amendment protection with respect to the charges under investigation in Maryland.  A defendant's Sixth Amendment right to counsel is "offense-specific."  *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991).  Because the Sixth Amendment right "does not attach until a prosecution is commenced," it is not a blanket right against contact by law enforcement with respect to all future prosecutions.  *Id.*; *accord Texas v. Cobb*, 532 U.S. 162, 173 (2001); *United States v. Mir*, 525 F.3d 351, 355–56 (4th Cir. 2008).  And the offenses alleged in the Maryland blood draw warrant and the D.C. complaint were plainly not the same.  In D.C., the complaint charged the Defendant with violating 18 U.S.C. §§ 1512(c)(2) (obstruction of Congress), 1752(a)(1) and (2) (unlawful entry on restricted buildings or grounds), and 40 U.S.C. § 5104(e)(2)(D) and (G) (violent entry, disorderly conduct, and other offenses on Capitol Grounds) in connection with his participation in the Capitol riot.  *See* Exh. A.  By contrast, the Maryland warrant authorized the execution of a blood draw in connection with an investigation of potential violations of 18 U.S.C. § 922(g)(3) (possession of firearms and ammunition by an unlawful user of any controlled substance) and 21 U.S.C. § 844(a) (unlawful possession of a controlled substance).  *See* Exh. C.  Thus, to the extent that any Sixth Amendment right had attached to the Defendant through his proceedings in D.C., the Defendant had no such right with respect to the offenses under investigation in Maryland on February 17, 2021.  Accordingly, there was no Sixth Amendment bar to the agents' contact with the Defendant concerning uncharged—indeed, unrelated—offenses without counsel present.

> 2.    The Defendant's Statements Were Volunteered.

The Court should also reject the Defendant's argument that his February 17 statements are inadmissible under *Miranda* or were otherwise obtained in violation of the Fifth Amendment.

*Miranda* applies only when a defendant is (1) in custody and (2) subject to interrogation. *See, e.g.*, *Montejo v. Louisiana*, 556 U.S. 778, 795 (2009).  Even assuming the Defendant was in

"custody" for *Miranda* purposes when he agreed to accompany Agent O'Rourke into the Medical Center, the Defendant was not subject to "interrogation" (or its functional equivalent) within the meaning of *Miranda* and its progeny. *See Pennsylvania v. Muniz*, 496 U.S. 582, 600–01 (1990) (plurality opinion) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)). "Interrogation" means "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *D'Anjou*, 16 F.3d at 608 (quoting *Muniz*, 496 U.S. at 600–01 (quoting *Innis*, 446 U.S. at 301)). But the Defendant's statements on February 17 were not a response to any words or actions on the part of law enforcement; the Defendant's statements were volunteered. And "[v]olunteered statements *of any kind* are not barred by the Fifth Amendment and their admissibility is not affected by [*Miranda*]." *Innis*, 446 U.S. at 300 (quoting *Miranda*, 384 U.S. at 478) (emphasis added).

Here, the agents did not merely decline to engage in interrogation—they affirmatively tried to avoid it.[9] Officer Sokolowski reminded the Defendant that agents were there solely for executing the search warrant, that the Defendant was not required to discuss any details of his case, and that he would not be asked about it. The Defendant, moreover, understood as much, admitting, "I know that I shouldn't be saying anything about this to you guys because of some Federal Code or whatever." The Defendant had even been reminded three days earlier by Agents Shappee and O'Rourke that they would not make contact with him to discuss his criminal case. That the Defendant nonetheless continued to make additional unprompted statements to agents did not

---

[9] The Defendant's incriminatory statement—that he doesn't "believe" in prescriptions—was not a response to *police* interrogation; it was the Defendant's response to a question asked by the RN for the purpose of medical treatment.

transform the encounter into police "interrogation" implicating *Miranda* or the Fifth Amendment.[10]

No different conclusion applies to Agent O'Rourke's brief response to the Defendant's spontaneous pronouncement that he had been diagnosed with "low T." The question whether the Defendant was "tak[ing] something" for the condition was not "reasonably likely" to elicit an incriminating response when the Defendant appeared to be explaining why he had been treated at the Medical Center—by a medical professional—for low testosterone. Accordingly, Agent O'Rourke's reaction to the Defendant's volunteered statement was not "interrogation" under *Miranda*. *Cf., e.g.*, *United States v. Johnson*, 734 F.3d 270, 277 (4th Cir. 2013) (holding that officers did not interrogate defendant by asking "what do you mean" after defendant voluntarily stated, "I can help you out, I don't want to go back to jail, I've got information for you"); *United States v. Rhodes*, 779 F.2d 1019, 1032 (4th Cir. 1985) (holding that officer did not interrogate defendant by asking "why" when defendant said officer could not seize notebook during search warrant).

Because the Defendant's statements on February 17 were, therefore, volunteered, their admission is not barred by the Fifth Amendment or the absence of *Miranda* warnings.

---

[10] The Defendant's subsequent unsolicited call to Agent O'Rourke on February 23 was even further evidence of the voluntary nature of the Defendant's engagement with law enforcement.

III.    **<u>CONCLUSION</u>**

For the foregoing reasons, the Court should deny the Defendant's Motion in its entirety.

<div style="margin-left: 40%;">

Respectfully submitted,

Erek L. Barron
United States Attorney

</div>

By:    _____/s/_____

<div style="margin-left: 45%;">

Jeffrey J. Izant
Assistant United States Attorney

</div>