**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. JKB-21-0458** |
| | * | |
| **ELIAS NICK COSTIANES,** | * | |
| | * | |
| **Defendant.** | * | |
| | ******* | |

**GOVERNMENT'S RESPONSE IN OPPOSITION**
**TO DEFENDANT'S MOTION TO DISMISS INDICTMENT**

The Defendant, Elias Nick Costianes, is now pending trial on a Superseding Indictment charging the Defendant with two counts of conspiracy to distribute and to possess with intent to distribute a controlled substance, in violation of 21 U.S.C. § 846; three counts of distributing a controlled substance, in violation of 21 U.S.C. § 841(a)(1); three counts of using a communication facility to facilitate a drug felony, in violation of 21 U.S.C. § 843(b); and one count of possession of a firearm or ammunition by an unlawful user of or addict to any controlled substance, in violation of 18 U.S.C. § 922(g)(3).  *See* Superseding Indictment, ECF 34.  On April 11, 2023, the Defendant filed a Motion to Dismiss Count Nine of the Indictment – possession of a firearm or ammunition by an unlawful user of or addict to any controlled substance – as unconstitutionally vague or in violation of the test articulated in *New York State Rifle & Pistol Ass'n v. Bruen,* __ U.S. __, 142 S.Ct. 2111 (2022).   ECF 66.  For the following reasons, the Court should deny the Defendant's Motion.

**I.      BACKGROUND**

On February 12, 2021, officers with the Federal Bureau of Investigation ("FBI") executed search and arrest warrants at the Defendant's residence in Nottingham, Maryland, as part of an investigation of the Defendant's participation in the riot at the United States Capitol on January

1

6, 2021.  As described in the government's Response in Opposition to the Defendant's Motion to Suppress Statements, *see* ECF 33, the Defendant was taken into custody, waived his *Miranda* rights, and agreed to be interviewed by FBI agents.

At approximately 6:40 a.m., the Defendant was interviewed by two members of the investigative team, Special Agent Kenneth Shappee and Special Agent Sean O'Rourke.  During the interview, the Defendant disclosed that he kept four firearms in cases behind a safe in the basement of his residence.  Specifically, the Defendant identified the firearms as: (1) a Glock 17, (2) a Smith & Wesson assault rifle, (3) a Remington shotgun (which the Defendant stated was a Valentine's Day present from his "ex"), and (4) a hunting rifle.  Consistent with the Defendant's statements, agents located the four unloaded firearms in the basement of the Defendant's residence—along with thousands of rounds of ammunition.  Elsewhere in the Defendant's residence, agents located an empty, used hypodermic needle, and four vials containing suspected testosterone, a Schedule III controlled substance.  During his transport to the District of Columbia, the Defendant also acknowledged that he still had a small quantity of marijuana, a Schedule I controlled substance, in a jar inside his personal vehicle.

Based on the seizure of firearms, ammunition, and suspected controlled substances from the Defendant's residence, among other evidence, the U.S. District Court in Maryland issued a second warrant authorizing FBI agents to draw a sample of the Defendant's blood to search for evidence of his illegal use and possession of controlled substances in Maryland, in possible violation of 18 U.S.C. § 922(g)(3) and 21 U.S.C. § 844(a).  On February 17, 2021, Agent O'Rourke met the Defendant outside 9000 Franklin Square Road, in Rossdale, Maryland – the location of MedStar Franklin Square Medical Center – where a blood sample was drawn.

While his blood was being collected, the Defendant made several spontaneous statements to agents. After the Registered Nurse ("RN") who collected the Defendant's blood sample informed the Defendant that his discharge paperwork was almost complete, the Defendant told the agents that he had been a patient at the Medical Center, that he had been diagnosed with "low T," and that he was "at 278," presumably referring to an unspecified blood-testosterone measurement.

Several minutes later, another RN came into the room. The RN asked the Defendant routine medical questions, including whether the Defendant was an existing patient of the Medical Center. The Defendant told the RN that he had been seeing a physician at the Medical Center for injuries sustained during an accident that occurred in 2020. The RN then asked where the Defendant was filling his prescriptions. The Defendant responded, "Oh, I don't believe in those." The Defendant was discharged shortly thereafter.

The subsequent analysis of data extracted from an iPhone seized from the Defendant's residence on February 12, 2021, revealed substantial evidence of the Defendant's possession and use of controlled substances, including testosterone, marijuana, and cocaine, a Schedule II controlled substance. That, coupled with the seizure of unprescribed testosterone and marijuana in the Defendant's residence and vehicle, and his admitted use of marijuana, gave rise to the allegations in Count Nine of the Superseding Indictment, which charges the Defendant with possession of a firearm and ammunition knowing that he was an unlawful user of or addict to any controlled substance.

## II.    ARGUMENT

The Defendant now moves to dismiss Count Nine of the Superseding Indictment as unconstitutionally vague and without the historical predicate the Supreme Court has required per *Bruen.*  The Defendant's arguments are meritless, and the motion should be denied.

First, 18 U.S.C. § 922(g)(3) is not unconstitutionally vague as a facial matter and the Defendant has failed to make any as-applied challenge.

Second, the clear weight of authority establishes that 18 U.S.C. § 922(g)(3) remains constitutional under *Bruen.*

### A.    Section 922(g)(3) Is Not Void for Vagueness

The charge tracks the statutory language.  And every court—including the Fourth Circuit—to have considered whether § 922(g)(3) is void for vagueness has upheld the statute. *See United States v. Cook*, 914 F.3d 545 (7th Cir.) (denying facial challenge), *vacated on other grounds*, 140 S. Ct. 41 (2019); *United States v. Bramer*, 832 F.3d 908 (8th Cir. 2016) (denying facial challenge); *United States v. Carter*, 669 F.3d 411, 416 (4th Cir. 2012) (citing *United States v. Dugan*, 657 F.3d 998 (9th Cir. 2011)); *United States v. Richard*, 350 F. App'x 252 (10th Cir. 2009) (denying as-applied challenge); *United States v. Monroe*, 233 F. App'x 879 (11th Cir. 2007) (denying as-applied challenge); *United States v. Patterson*, 431 F.3d 832 (5th Cir. 2005) (denying as-applied challenge); *United States v. Hatches*, 75 F. App'x 188 (4th Cir. 2003) ("We likewise reject Hatches's alternative argument that the statute is unconstitutionally vague.").

The Defendant's argument boils down to a request that the Court ignore every case that ever has ruled on the issue and instead focus on a purported sea-change brought about in 2015 by the Supreme Court's decision in *Johnson v. United States*, 576 U.S. 591 (2015).  According to the Defendant, *Johnson* now permits a facial vagueness challenge to every statute, even outside

the First Amendment context.  *See* ECF 66 at 3.  But the Fourth Circuit already has noted the

limitations of the *Johnson* holding, stating that "if a law clearly prohibits a defendant's conduct,

the defendant cannot challenge, and a court cannot examine, whether the law may be vague for

other hypothetical defendants."  *United States v. Hosford*, 843 F.3d 161, 170 (4th Cir. 2016)

(affirming Judge Chasanow's rejection of facial vagueness challenge to 18 U.S.C.

§ 922(a)(1)(A)); *see id*. ("'A plaintiff who engages in some conduct that is clearly proscribed

cannot complain of the vagueness of the law as applied to the conduct of others.'" (*quoting*

*Holder v. Humanitarian Law Project,* 561 U.S. 1, 18-19 (2010))); *see also United States v.*

*Morrison*, 844 F.2d 1057, 1071 (4th Cir. 1988) ("[I]t is settled beyond controversy that if one is

not of the rare 'entrapped' innocents but one to whom the statute clearly applies, irrespective of

any claims of vagueness, he has no standing to challenge successfully the statute under which he

is charged for vagueness.").

        Even more recently, the Fourth Circuit – like several other Circuit and district courts –

has confirmed this principle in the specific context of a challenge to 18 U.S.C. § 922(g)(3).

*United States v. Hasson,* 26 F.4th 610 (4th Cir. 2022) ("[W]e conclude that *Johnson* and

[*Sessions v. Dimaya*, 138 S. Ct. 1204 (2018)] 'did not alter the general rule that a defendant

whose conduct is clearly prohibited by a statute cannot be the one to make a facial vagueness

challenge.'" (quoting *Cook,* 914 F.3d at 877)); *accord United States v. Carter*, 750 F.3d 462,

468-470 (4th Cir. 2014); *Bramer*, 832 F.3d 908; *United States v. Kimbrough*, 319 F. Supp. 3d

912 (M.D. Tenn. 2018) (finding that *Johnson* "has no straightforward application to 18 U.S.C.

§ 922(g)(3) because this statute does not contain the same infirmities identified in *Johnson*");

*United States v. Bell*, 2017 WL 1479376, at *5 (D. Kan. Apr. 25, 2017) ("[T]he court has

searched to see if any case has extended *Johnson* in the fashion [the defendant] urges the court to

adopt.  It located none.  Indeed, the court's research has shown just the opposite."); *United States v. Holmes*, 2016 WL 54918, at *2 (E.D. Wisc. Jan. 5, 2016) (observing that "Section 922(g)(3) has not created a 'black hole of confusion'" as did the residual clause of the ACCA in *Johnson*); *United States v. Phommaseng*, 2015 WL 5937595, at *15 (D. Kan. Oct. 12, 2015) ("*Johnson* considered the residual clause in the definition of 'violent felony,' which had previously required courts to use a 'categorical approach' to determine which offenses were captured by the definition.  This approach required courts to look at how the law defined an offense, and not how an individual defendant committed the particular crime at issue.  There is no such categorical approach at issue in construing § 922(g). Nor has the Court located any case law that has extended *Johnson* as urged by Defendant.").

Since an as-applied vagueness challenge is the only avenue available to the Defendant, and since the Defendant did not make an as-applied challenge, the Court should deny the motion on the ground that the statute is unconstitutionally vague.

###    B.    18 U.S.C. § 922(g)(3) Does Not Fall in the Wake of *Bruen*

Although recent developments in Second Amendment jurisprudence have changed the legal landscape, the *Bruen* decision does not upend the law in this case.  As such, this Court should reject the Defendant's Second Amendment challenge and permit the prosecution of the Defendant for possessing firearms and ammunition while being an unlawful user of or addicted to any controlled substance, in violation of 18 U.S.C. § 922(g)(3).

The Second Amendment provides that "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.

More than fourteen years ago, the Supreme Court concluded that the Second Amendment confers an "individual right to keep and bear arms in case of confrontation." *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008). The "central" aspect of this right is the "right to self-defense." *Id.* at 628. The Court noted, however, that, as with other fundamental rights, "the right secured by the Second Amendment is not unlimited." *Id.* at 626. The Court stressed that its decisions in this context apply to "law-abiding, responsible citizens," and further noted that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* In fact, according to the Court, such restrictions are "presumptively lawful regulatory measures" and that its list was not exhaustive. *Id.* at 627 n.26.

The Court recently elaborated on the framework of its Second Amendment analysis in *Bruen*. In that case, the Court analyzed the constitutionality of a New York firearms licensing scheme wherein an applicant was required to prove that he or she had "proper cause" to carry a handgun in public for self-defense. *Bruen*, 142 S. Ct. at 2123. The Court struck down the "proper cause" requirement as too subjective and violative of the Second Amendment. *Id.* at 2156. In reaching this conclusion, the Court laid out the proper analytical process for determining whether a firearm regulation is constitutional under the Second Amendment. Courts are required to "assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Id.* at 2131.

To make this assessment, a court must engage in a two-step analysis. First, the court must determine whether "the Second Amendment's plain text covers an individual's conduct."

*Id.* at 2126.  If it does not, the analysis ends, and the government's regulation is valid.  If the conduct at issue is covered by the Amendment's text, the conduct is presumed protected, and the government must "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation."  *Id.*  Only if a firearm regulation is consistent with this Nation's historical traditional may a court conclude that the individual's conduct falls outside the Second Amendment's protections.  *Id.*  Drawing on that tradition, *Heller* recognized, and *Bruen* reiterated, that the right to bear arms belongs only to "law-abiding, responsible citizens."  *Id.* at 2131 (quoting *Heller*, 554 U.S. at 635).

In conducting this historical analysis, the Court recognized that the government need not present a one-to-one comparison between regulations in existence in 1791 and those at issue in the present litigation.  Rather, the government may demonstrate historical acceptance of a regulation by "analogy" to a similar regulation that existed in the Founding Era.  *Id.* at 2132.  In this way, the test in *Bruen* only requires a showing of a historical example that is "relevantly similar" to the current regulation.  *Id.*  In other words, the government only has to provide evidence of a "representative historical *analogue*, not a historical *twin*."  *Id.* at 2133 (emphasis in original).

Applying the Court's framework makes clear that the prohibitions in 18 U.S.C. § 922(g)(3) are constitutional, requiring this Court to reject the Defendant's Second Amendment challenge.

<u>*Bruen*:  First Step</u>

In much post-*Bruen* litigation, the government has taken the position that defendants who are similarly situated to this Defendant cannot satisfy the first step of the *Bruen* test because they are not "law abiding" citizens to whom Second Amendment rights are afforded*.  See, e.g.*, *United*

*States v. Daniels*, 610 F.Supp.3d 892, 893 (S.D. Miss. July 8, 2022) (recognizing "some doubt" that § 922(g)(3) is "textually covered by the Second Amendment, insofar as it has been interpreted to guarantee the right to keep and bear arms to ordinary, law-abiding, responsible citizens concerned with self-defense"); *United States v. Seiwerts*, __ F.Supp.3d __, 2022 WL 4534605, at *2 (N.D. Ill. Sep. 28, 2022) (habitual drug user fell outside scope of individuals protected by Second Amendment). However, even assuming that the Defendant falls within the class of persons who are potentially entitled to Second Amendment protections, the Defendant's motion fails at the second step of the *Bruen* analysis and should, therefore, be denied.

    *Bruen*:  Second Step

    Anglo-American law has long categorically limited the gun rights of certain presumptively dangerous persons to promote public safety.  In seventeenth-century England, officers of the Crown could "seize all arms in the custody or possession of any person" whom they "judge[d] dangerous to the Peace of the Kingdom."  Militia Act of 1662, 13 & 14 Car. 2, c.3, § 13 (1662). The 1689 English Bill of Rights – which *Heller* identified as a "predecessor of our Second Amendment," 554 U.S. at 593 – provided that English subjects "may have Arms for their Defence *suitable to their Conditions*, and as allowed by Law."  *Id*. (citing 1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441) (emphasis added).  Simply put, "by the time of American independence, England had established a well-practiced tradition of disarming dangerous persons – violent persons and disaffected persons perceived as threatening to the crown."  Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Firearms*, 20 Wyo. L. Rev. 249, 261 (2020); *see also* Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo–American Right* 123 (1994); Patrick J. Charles, "*Arms for Their Defense"?: An Historical, Legal, and Textual Analysis of the English Right to Have Arms and*

*Whether Case the Second Amendment Should Be Incorporated in McDonald v. City of Chicago*, 57 Clev. St. L. Rev. 351, 376, 382–83 (2009).

The English colonies in North America – and later the states of the newly independent America – carried forward this tradition.  One illustrative example (which *Heller* characterized as a "Second Amendment precursor," 554 U.S. at 604), is "The Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents, 1787," signed by Pennsylvania delegates to the Constitutional Conventional who voted against ratification of the Constitution, due to the absence of a Bill of Rights.  The "Address" declared that "the people have a right to bear arms for the defense of themselves . . . and no law shall be passed for disarming the people or any of them *unless for crimes committed, or real danger of public injury from individuals*."  2 Bernard Schwartz, The Bill of Rights: A Documentary History 662, 665 (1971) (emphasis added).  Once ratified, the Second Amendment incorporated "a common-law tradition that permit[ted] restrictions directed at citizens who [were] not law abiding and responsible" and "'[did] not preclude laws disarming the unvirtuous (*i.e.* criminals).'"  *United States v. Bena*, 664 F.3d 1180, 1183–84 (8th Cir. 2011) (quoting Don B. Kates, Jr., *The Second Amendment: A Dialogue*, Law & Contemp. Probs. 146 (Winter 1986)).

By the second half of the nineteenth century, American jurist Thomas M. Cooley could proclaim (in a treatise *Heller* described as "massively popular," 554 U.S. at 616) that certain persons – namely, "the idiot, the lunatic, and the felon, on obvious grounds" – had long been "almost universally excluded" from exercising certain civic rights in America, including the right to bear arms.  Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 29 (1st ed. 1868).  Not surprisingly, then, "most scholars of the Second Amendment agree that the right to bear arms was tied to the

Case 1:21-cr-00458-JKB   Document 67   Filed 04/24/23   Page 11 of 20

concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.'" *United States v. Carpio-Leon*, 701 F.3d 974, 979–80 (4th Cir. 2012) (quoting *United States v. Yancey*, 621 F.3d 681, 684–85 (7th Cir. 2010)); *see Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 201 (5th Cir. 2012) (noting that "at the time of the founding, 'the right to arms was inextricably and multifariously linked to that of civic virtu [sic] (i.e., the virtuous citizenry),' and that '[o]ne implication of this emphasis on the virtuous citizen is that the right to arms does not preclude laws disarming the unvirtuous citizens (i.e., criminals) or those who, like children or the mentally imbalanced, are deemed incapable of virtue.'" (quoting Don Kates & Clayton Cramer, *Second Amendment Limitations and Criminological Considerations*, 60 Hastings L.J. 1339, 1359–60 (2009))).

This broad tradition -- limiting gun rights to responsible, law-abiding, mentally competent citizens – produced many specific firearm restrictions that targeted certain presumptively dangerous persons. Three notable examples are restrictions against felons, the mentally ill, and the intoxicated.

One of the nation's most deeply rooted firearm restrictions is the "longstanding prohibitions on the possession of firearms by felons." *Heller*, 554 U.S. at 626; *see* Robert Dowlut, *The Right to Arms: Does the Constitution or the Predilection of Judges Reign*?, 36 Okla. L.Rev. 65, 96 (1983) ("Colonial and English societies of the eighteenth century . . . excluded . . . felons [from possessing firearms]."); Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 Mich. L.Rev. 203, 266 (1983) ("Founders [did not] consider felons within the common law right to arms."). Firearm regulations targeting felons exemplify the link that Americans have historically drawn between the right to bear arms and the concept of virtuous, law-abiding citizenry. Americans have long justified laws prohibiting felons

11

from possessing firearms by invoking the idea that "someone with a felony conviction on his record is more likely than a nonfelon to engage in illegal and violent gun use," and thus, if armed, would pose a unique danger to the public.  *Yancey*, 621 F.3d at 685.

Americans also have traditionally – and wisely – viewed the mentally ill as persons who cannot bear arms without posing real danger to public safety.  *See Heller*, 554 U.S. at 626 (noting the "longstanding prohibitions on the possession of firearms by . . . the mentally ill"); *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 786 ("We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by . . . the mentally ill.'" (quoting *Heller*, 554 U.S. at 626)).  As a general matter, in England, justices of the peace could lock up "dangerous lunatics" and seize their property.  *See* Richard Moran, *The Origin of Insanity as A Special Verdict: The Trial for Treason of James Hadfield*, 19 Law & Soc'y Rev. 487 (1985) (citing Vagrancy Act of 1744, 17 Geo. 2, c. 5).  Similarly, "in eighteenth-century America, justices of the peace were authorized to lock up 'lunatics' who were 'dangerous.'"  Carlton F.W. Larson, *Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1377 (2009).  As the Third Circuit has aptly concluded, in reflecting on this historical tradition, "if taking away a lunatic's liberty was permissible, then we should find the 'lesser intrusion' of taking his or her firearms was also permissible."  *Beers v. Att'y Gen.*, 927 F.3d 150, 158 (3d Cir. 2019), *vacated on other grounds*, *Beers v. Barr*, 140 S. Ct. 2758 (2020); *see United States v. Emerson,* 270 F.3d 203, 226 n.21 (5th Cir. 2001) (noting how "lunatics" and "those of unsound mind" were historically prohibited from possessing a firearm); *United States v. Bena*, 664 F.3d 1180, 1183 (8th Cir. 2011) (concluding that historically "the right to arms does not preclude laws disarming . . . the mentally unbalanced").

Finally, state laws have also historically prohibited carrying a firearm while under the influence of alcohol.  In 1655, Virginia prohibited "shoot[ing] any gunns at drinkeing."  Act XII of March 10, 1655, 1655 Va. Laws 401, 401–02.  In 1771, New York prohibited firing guns during the New Year's holiday, a restriction that "was aimed at preventing the 'great Damages . . . frequently done on [those days] by persons . . . being often intoxicated with Liquor.'"  *Heller*, 554 U.S. at 632 (quoting Ch. 1501, 5 Colonial Laws of New York 244–46 (1894)).  After the ratification of the Fourteenth Amendment in 1868, which extended the Second Amendment to the states, *see McDonald*, 561 U.S. at 742, many states enacted statutes prohibiting intoxicated persons from possessing, using, or receiving firearms.  *See, e.g*., Kansas Gen. Stat., Crimes & Punishments § 282 (1868) (providing that "any person under the influence of intoxicating drink" may not "carr[y] on his person a pistol … or other dangerous weapon"); 1878 Miss. Laws 175–76 § 2 (making it unlawful to sell pistols and certain knives to a "person intoxicated"); 1883 Mo. Laws 76, § 1 (prohibiting carrying a dangerous weapon "when intoxicated"); 1883 Wis. Sess. Laws 290, Offenses Against Lives and Persons of Individuals, ch. 329 § 3 ("It shall be unlawful for any person in a state of intoxication, to go armed with any pistol or revolver."); 1890 Okla. Sess. Laws 495, art. 47, § 4 (forbidding officers from "carrying … arms while under the influence of intoxicating drinks"); 1899 S.C. Acts 97, No. 67, § 1 (forbidding "boisterous conduct" while "under the influence of intoxicating liquors," including "discharg[ing] any gun" near a public road).

Importantly, the justification for all three prohibitions has historically been the same: felons, the mentally ill, and the intoxicated are presumptively risky persons who pose a danger to public safety if armed.  And this historical tradition of gun regulations prohibiting felons, the mentally ill, and the intoxicated from possessing firearms is "relevantly similar" to the

prohibition in § 922(g)(3). *Bruen,* 142 S. Ct. at 2132. All of the restrictions impose a comparable burden: they categorically prohibit certain persons from possessing firearms. And they all proceed under a comparable justification: they protect public safety by keeping guns out of the hands of presumptively dangerous persons, namely, lawbreakers and persons with impaired judgment or mental ability.

Moreover, Congress enacted § 922(g)(3) for precisely this purpose, and it justified the law in these terms. *See, e.g.*, S. Rep. No. 90-1501, at 22 (1968) ("The ready availability, that is, the ease with which any person can anonymously acquire firearms (including criminals, juveniles without the consent of their parents or guardians, *narcotic addicts*, mental defectives, armed groups who would supplant duly constituted public authorities, and others whose possession of firearms is similarly contrary to the public interest) is a matter of serious national concern.") (emphasis added). As the Supreme Court has recognized, "Congress' intent in enacting § 922(g) . . . was to keep firearms out of the hands of presumptively risky people." *Dickerson v. New Banner Inst., Inc.*, 460 U.S. 103, 113 (1983). And lower federal courts have recognized the same congressional purpose in § 922(g)(3), specifically. *See, e.g.*, *United States v. Seay*, 620 F.3d 919, 925 (8th Cir. 2010) ("[I]n passing § 922(g)(3), Congress expressed its intention to keep firearms out of the possession of drug abusers, a dangerous class of individuals."); *United States v. Cheeseman*, 600 F.3d 270, 280 (3d Cir. 2010) (noting "Congress' intent to keep firearms out of the possession of drug abusers, a dangerous class of individuals").

In light of Congress's justification for § 922(g)(3), it is easy to see why "[k]eeping guns away from habitual drug abusers is analogous to disarming felons." *Yancey*, 621 F.3d at 684. As previously discussed, ample historical scholarship has established that the Second Amendment right to bear arms was closely tied to the concept of a virtuous citizenry and to the

notion that the government could disarm lawbreaking or otherwise unvirtuous citizens who posed a risk to public safety. And so, in prohibiting felons from bearing arms, "Congress sought . . . to keep guns out of the hands of those who have demonstrated that they may not be trusted to possess a firearm without becoming a threat to society." *Scarborough v. United States*, 431 U.S. 563, 572 (1977). This justification undergirds both longstanding firearm restrictions against felons and unlawful drug users or drug addicts. The notion that "someone with a felony conviction on his record is more likely than a nonfelon to engage in illegal and violent gun use . . . applies with equal force to Congress's extension of the firearms ban to another category of habitual criminals with § 922(g)(3)." *Yancey*, 621 F.3d at 685.

Section 922(g)(3) is likewise analogous in its justification to laws disarming the mentally ill or intoxicated. As one Circuit Court has aptly explained, "habitual drug abusers, like the mentally ill, are more likely to have difficulty exercising self-control, making it dangerous for them to possess deadly firearms." *Id.*; *accord United States v. Dugan*, 657 F.3d 998, 999 (9th Cir. 2011) (noting, in upholding § 922(g)(3), that "habitual drug users, like . . . the mentally ill, more likely will have difficulty exercising self-control, particularly when they are under the influence of controlled substances"). In this regard, it is notable that federal regulations define "unlawful user" in § 922(g)(3) as, in part, one who has "lost the power of self-control with reference to the use of controlled substance." 27 C.F.R. § 478.11.

Although there does not yet appear to be any post-*Bruen* Circuit Court decision addressing the constitutionality of § 922(g)(3), at least ten district courts have issued written decisions addressing post-*Bruen* Second Amendment challenges raised in motions to dismiss § 922(g)(3) counts, and all but two have rejected those challenges. *See United States v. Le*, __ F.Supp.3d __, 2023 WL 3016297 (S.D. Iowa Apr. 11, 2023) (denying motion to dismiss); *United*

*States v. Connelly*, __ F.Supp.3d __, 2023 WL 2806324 (W.D. Tex. Apr. 6, 2023) (granting

motion by reconsidering and reversing prior denial of motion); *United States v. Stennerson*, __

F.Supp.3d __, 2023 WL 2214351 (D. Mont. Feb. 24, 2023) (denying motion to dismiss); *Posey*,

2023 WL 1869095 (same); *United States v. Harrison*, __ F.Supp.3d __, 2023 WL 1771138

(W.D. Okla. Feb. 3, 2023) (granting motion to dismiss); *United States v. Lewis*, __ F.Supp.3d __

2023 WL 187582 (W.D. Okla. Jan. 13, 2023) (denying motion to dismiss); *United States v.*

*Blake*, __ F. Supp. 3d __, 2023 WL 122920 (W.D. La. Jan. 6, 2023) (same); *United States v.*

*Sanchez*, __ F. Supp. 3d __, 2022 WL 17815116 (W.D. Tex. Dec. 19, 2022) (same); *United*

*States v. Seiwert*, __ F.Supp.3d __, 2022 WL 4534605 (N.D. Ill. Sept. 28, 2022) (same); *United*

*States v Daniels*, 2022 WL 2654232 (S.D. Miss. July 8, 2022) (same). A number of district

courts have also denied post-*Bruen* motions to dismiss § 922(g)(3) counts in unpublished

opinions. *See United States v. Wilson*, 22-0069-RGE (S.D. Iowa Apr. 6, 2023); *United States v.*

*Tucker*, 22-cr-0164-RGE (S.D. Iowa Apr. 3, 2023); *United States v. Randall*, 22-cr-0099-SMR

(S.D. Iowa Feb. 14, 2023); *United States v. Beverly*, 21-cr-0036-TSK (N.D. W. Va. Jan. 3,

2023); *United States v. Kelley*, 22-cr-0395-F (W.D. Okla. Jan. 3, 2023); *United States v. Veasley*,

20-cr-00209-RGE (S.D. Iowa Sep. 22, 2022); *United States v. Doty*, 21-cr-0021-JPB (N.D.

W.Va. Sep. 9, 2022).

　　　　Courts have also rejected post-*Bruen* Second Amendment challenges to § 922(g)(3) in the

civil context. In *Fried v. Garland*, __ F.Supp.3d __, 2022 WL 16731233 (N.D. Fla. Nov. 4,

2022), the court granted the government's motion to dismiss an action brought to affirmatively

enjoin the Department of Defense from enforcing 922(g)(3) against users of medical marijuana

who are authorized by Florida law to use a substance that remains federally controlled. And, in

*United States v. Cleveland-McMichael*, __ F.Supp.3d __, 2023 WL 2613548 (D. Alaska Mar. 23,

2023), the court dismissed a motion to vacate a 2018 conviction for violating § 922(g)(3),

without reaching the merits of the post-*Bruen* Second Amendment claim.

Only the district courts in *Harrison* and *Connelly* found § 922(g)(3) to be constitutionally

infirm in the wake of *Bruen*.  In *Harrison*, the court concluded that, while Congress may disarm

"those who have demonstrated a proclivity for violence through past violent, forceful, or

threatening conduct," the mere fact of marijuana use did not inform of that proclivity.  2023 WL

1771138, *17.  The court in *Connelly* likewise found that the government had failed to carry its

burden to demonstrate that § 922(g)(3) was "consistent with the Nation's historical tradition of

firearm regulation."  2023 WL 2806324, at *12.  But these decisions are outliers.  And they are

outliers because they are not as persuasive as the far greater weight of authority concluding that

the prohibitions in § 922(g)(3) are "relevantly similar" to historic firearm restrictions.

In *Posey*, for example, the court concluded that the government had carried its burden to

show that § 922(g)(3) was consistent with historical firearms regulation in the United States.  In

so concluding, the court cited the Seventh Circuit's decision in *Yancey*, 621 F.3d 681, which

rejected a Second Amendment challenge to § 922(g)(3) and recognized that, while Congress did

not bar habitual drug users from owning guns until 1968, this development did not occur in a

vacuum.  *See Posey*, 2023 WL 1869095, at *7-8.  Following the reasoning in *Yancey*, the *Posey*

observed that numerous state legislatures had "entrenched" regulations "restric[ting] the right of

habitual drug users or alcoholics to possess or carry firearms."  *Id.* (quoting *Yancey*, 621 F.3d at

684).  These regulations demonstrated that Congress was not alone in considering habitual drug

users unfit to possess firearms and that the prohibition was "the latest incarnation of the states'

unbroken history of regulating the possession and use of firearms dating back to the time of the

amendment's ratification."  *Id.*  The *Posey* court also reasoned that *Yancey*'s historical analysis

was positively cited by other courts in rejecting post-*Bruen* challenges to § 922(g)(3), indicating *Yancey*'s continued validity.  *See Posey*, 2023 WL 1869095, at *8 (citing *Daniels*, 2022 WL 2654232, at *3 (upholding § 922(g)(3) in part based on historical analysis in *Yancey* and other circuit court decisions); *Seiwert*, 2022 WL 4534605 (upholding § 922(g)(3)); *Blake*, 2023 WL 122920 at *4 (upholding § 922(g)(3) and citing *Yancey*'s analysis)).

In addition to *Yancey*, *Posey* also relied on the court's findings in *Fried*, which described a history of statutes from the nation's founding and reconstruction eras that restricted gun possession by the intoxicated.  *See* 2022 WL 16731233, at *7 (describing 1655 Virginia statute, 1771 New York statute, and several from era following the ratification of Fourteenth Amendment).  Some of these statutes prevented individuals from carrying firearms while intoxicated, and others prohibited individuals from firing guns while intoxicated.  *Id.*  The *Posey* court concluded that these additional historical examples of statutes regulating firearm possession and use by individuals using intoxicating substances supplemented and affirmed the historical findings in *Yancey*.  *See Posey,* 2023 WL 1869095, at *8.

Moreover, *Posey* explained why the prohibition in § 922(g)(3) was analogous to the historical intoxication statutes.  Under the historical regulations, the intoxicated could not carry or use firearms; under the modern regulation, only an *active drug user* cannot possess firearms. Accordingly, the Second Amendment rights of the persons using intoxicating substances are only impaired for the duration of the period individuals are using intoxicating substances.  *See Posey,* 2023 WL 1869095, *8; *see also Yancey*, 621 F.3d at 687 ("the gun ban [in § 922(g)(3)] extends only so long as Yancey abuses drugs").  Both groups could easily regain their Second Amendment rights by simply ending their illegal use of substances.  *See Fried*, 2022 WL 16731233 at *7.  While these historical regulations may not be "dead ringer[s]" for § 922(g)(3),

they are not required to be, and are nonetheless sufficiently analogous. *Posey,* 2023 WL 1869095, at *10 (citing *Bruen*, 142 S. Ct. at 2133).

Likewise, the court in *Lewis*, for example, explained why the prohibitions in § 922(g)(3) were sufficiently analogous to satisfy step two of the *Buren* analysis. The court held that, after *Bruen*, the historical analogue proffered by the government should not be too old, too new, too isolated, or too British, and that the historical analogue should not be noticeably less burdensome than the challenged provision. *See Lewis,* 2023 WL 187582, at *3. The *Lewis* court added that:

> [I]t is also worth noting that Justice Kavanaugh, although joining the Court's opinion, wrote a concurring opinion, in which the Chief Justice joined. If we read that concurrence as an indication of how far the concurring Justices might go in applying the broad pronouncements of the majority opinion, it is fair to say that the tone of the joint concurrence throttles back just a bit on what one might otherwise infer from the 6-to-3 majority opinion in terms of how close a historical analogue has to be in order to support the constitutionality of a modern gun law. This court's determination of whether a historical analogue is good enough under *Bruen* is also influenced by an assumption that it is unlikely that the Supreme Court intended to sign up for decades of resolution of circuit splits (to say nothing of decades of divergent outcomes among 50 state courts of last resort) as the lower courts sort through the infinite number of possible permutations–variations in causes for restrictions, types of guns covered, types of conduct covered, severity and duration of the burden, and procedural niceties, to name but a few–in gun legislation.

*Id.*

The *Lewis* court recognized that the government's burden was merely to "prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at *4. Lewis then observed that *Bruen* itself stated:

> To be clear, analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check. On the one hand, courts should not uphold every modern law that remotely resembles a historical analogue, because doing so risks endorsing outliers that our ancestors would never have accepted. On the other hand, analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin.* So even if a modern-day regulation is not a dead ringer for

historical precursors, it still may be analogous enough to pass constitutional muster.

*Id.* (quoting *Bruen*, 142 S. Ct. at 2133). The *Lewis* court then concluded that "§ 922(g)(3) is relevantly similar to regulations aimed at preventing dangerous or untrustworthy persons from possessing and using firearms, such as individuals convicted of felonies or suffering from mental illness," or individuals who are intoxicated. *Id.* (citing *United States v. Seiwert*, 2022 WL 4534605, at *2. This Court should do the same.

## III.    CONCLUSION

For the foregoing reasons, the Court should deny the Defendant's Motion.

Respectfully submitted,

Erek L. Barron
United States Attorney

/ss/

By:    _____
P. Michael Cunningham
Jeffrey J. Izant
Assistant United States Attorneys